UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/2017

NINA S. MCBRIDE-MEYERS,                     :
                                            :
                            Plaintiff,      :        ORDER AND OPINION
            - against -                     :        16-CV-5696 (RLE)
                                            :
NANCY A. BERRYHILL,                         :
Acting Commissioner of Social Security,     :
                                            :
                            Defendant.      :

HONORABLE RONALD L. ELLIS, U.S.M.J.:

## I.     INTRODUCTION

Plaintiff Nina Sonya McBride-Meyers ("McBride-Meyers") commenced this action

under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner"), denying her application for

Disability Insurance Benefits ("DIB"). The Parties consented to the jurisdiction of the

undersigned on May 5, 2017, pursuant to 28 U.S.C § 636(c). (Doc. No. 18.) Before the Court

are the Parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure. (Doc. Nos. 12 and 14.) McBride-Meyers seeks remand for an award

of benefits, asserting that the ALJ improperly (1) weighed the medical evidence in this case in

accordance with the treating physician rule; (2) determined McBride-Meyers's Residual

Functional Capacity ("RFC"); and (3) evaluated McBride-Meyers's credibility. (Plaintiff's

Memorandum of Law in Support ("Pl. Mem.") at 6-13.) On February 13, 2017, the

Commissioner filed a cross-motion for judgment on the pleadings asking the Court to affirm the

Commissioner's final decision. (Doc. No. 15.) For the reasons set forth below, McBride-

Meyers's motion is **GRANTED** in part, the cross motion is **DENIED**, and the case is

**REMANDED** for further proceedings consistent with this Opinion.

## II.    BACKGROUND

### A. Procedural History

McBride-Meyers applied for DIB on July 15, 2013. (Transcript of Administrative Proceedings ("Tr.") at 63-70.) The Social Security Administration denied McBride-Meyers's request on October 17, 2013, and she requested a hearing before an ALJ to review the determination (*Id.* at 72-81.) ALJ Louis M. Catanese held a hearing on April 23, 2015. (*Id.* at 37.) In a decision dated June 1, 2015, the ALJ determined that McBride-Meyers was not disabled within the meaning of the Act, and therefore was not entitled to DIB. (*Id.* at 20-36.) On June 25, 2015, McBride-Meyers sought review of the ALJ's determination by the Appeals Council. (*Id.* at 17-19.) On May 24, 2016, the Appeals Council denied McBride-Meyers's request for review, and ALJ Catanese's June 1, 2015 decision became the final decision of the Agency. (*Id.* at 1-4.) McBride-Meyers initiated this action on July 18, 2016. (Doc. No. 1.)

### B. ALJ Hearing and Other Sworn Statements

At the April 23, 2015 hearing, McBride-Meyers was represented by attorney John Forte. (Tr. at 39, 61.) On the day of the hearing, McBride-Meyers was fifty-three (53) years old and had completed one year of college. (*Id.* at 42, 44.) She lived with her husband and son in an apartment in the Bronx. (*Id.*) Before the period at issue, McBride-Meyers worked full-time as a bookkeeper for twenty-six (26) years. (*Id.* at 48.) While serving as a bookkeeper, she estimated lifting and carrying no more than twenty (20) pounds. (*Id.*) McBride-Meyers was laid off on April 11, 2013, when her employer, Food City Markets, closed. (*Id.* at 48.) On April 12, 2013, after experiencing shortness of breath and swollen legs, McBride-Meyers visited a board-certified cardiologist, Dr. Ariaratnam Gobikrishna, who discovered a blood clot behind her left leg and diagnosed her with congestive heart failure and high blood pressure. (Tr. at 49, 51.)

2

During the hearing, McBride-Meyers testified to her ability to clean and dress herself, cook meals, vacuum, drive, and do laundry. (*Id.* at 44-45.) She did laundry once every two to three weeks, drove locally twice a month, and attended an hour-and-a-half to two-hour sewing class once a week for approximately two months. (*Id.* at 44-46.) She attested to needing to "take breaks in between getting dress[ed]" and to "take [her] time" while showering. (*Id.* at 171.) Despite having a pacemaker implanted in August 2014, McBride-Meyers testified that her symptoms were unchanged. (*Id.* at 55.) She discussed her inability to sleep at night, constant fatigue, and need to nap throughout the day. (*Id.* at 46-47, 51, 54.) She testified to the difficulty she experienced standing and sitting for more than two hours and walking up and down stairs. (*Id.* at 54-55.) She also described chest pains, which she experienced "a couple times during the day" for "a couple of seconds," and dizziness from bending (*Id.* at 52, 54-55.)

## C. Medical Evidence

In 2006, McBride-Meyers was diagnosed with breast cancer. (Tr. at 49, 282, 372, 381, 705, 745.) Mammograms conducted by board-certified oncologist, Dr. Della F. Makower, revealed that McBride-Meyers's cancer was in remission on the day of the ALJ hearing. (*Id.* at 50, 609.) On April 12, 2013, a chest x-ray revealed that McBride-Meyers had an enlarged heart. (*Id.* at 245, 324.) An echocardiogram confirmed her left ventricle ejection fraction ("LVEF")[1] to be twenty (20) percent, and a stress test revealed reduced blood flow and oxygen to the heart. (Tr. at 245, 324.) McBride-Meyers was subsequently categorized as New York Heart

---

[1] Ejection fraction measures how well the heart is pumping out blood. A normal heart's ejection fraction is between fifty to seventy percent. A measurement under forty percent may be evidence of heart failure or cardiomyopathy. One can have heart failure and maintain a normal ejection fraction. *Ejection Fraction, Heart Failure, Measurement*. AMERICAN HEART ASSOCIATION, http://www.heart.org/HEARTORG/Conditions/HeartFailure/DiagnosingHeartFailure/Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp (last visited July 10, 2017).

Association ("NYHA") Class III.[2]  (Tr. at 324.)  After a follow-up appointment with Dr. Gobikrishna on April 26, 2013, her LVEF improved slightly, but was still less than thirty-five (35) percent.  (*Id.* at 478.)  On May 1, 2013, McBride-Meyers underwent a cardiac catheterization, which revealed a LVEF of forty-one (41) percent and moderate non-ischemic myocardial disease.[3]  (*Id.* at 262-64.)

On May 14, 2014, McBride-Meyers's primary care physician, Dr. Marilou Corpuz, board-certified in internal medicine, noted that McBride-Meyers had a tachycardiac[4] heart rate and diagnosed her with chronic systolic heart failure and obesity. (*Id.* at 287-88.)  On June 26, 2014, a Multi-Gated Acquisition Scan ("MUGA") revealed "severe global wall motion abnormalities," a moderately dilated left ventricle at rest, and a LVEF of twenty-six (26) percent. (*Id.* at 699.)  On August 22, 2014, McBride-Meyers was referred to the Arrhythmia Service for a prophylactic implantable cardioverter defibrillator ("ICD")[5], or pacemaker, because of her severe congestive heart failure "despite medical treatment over one year."  (*Id.* at 728-29.)  On August 26, 2014, board-certified cardiologist, Dr. Soo G. Kim, surgically implanted a pacemaker in McBride-Meyers's heart.  (*Id.* at 498.)  During a follow-up appointment on October 3, 2014, Dr. Kim diagnosed McBride-Meyers with chronic heart failure and non-ischemic heart disease.   (Tr. at 718.)  Although McBride-Meyers complained of one to two-minute long palpitations

---

[2] The NYHA Functional Classification is the most commonly used system, placing patients in one of four categories based on how much they are limited during physical activity.  Class III status is based on patient symptoms and defined as "marked limitation of physical activity, comfortable at rest, less than ordinary activity causes fatigue, palpitation, or dyspnea" (shortness of breath).  *Classes of Heart Failure*.  AMERICAN HEART ASSOCIATION, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last visited June 16, 2017).

[3] Non-ischemic myocardial disease is a global, rather than localized, abnormality of ventricular contractions. Follath, F. *Nonischemic Heart Failure: Epidemiology, Pathophysiology, and Progression of Disease*, PUBMED, https://www.ncbi.nlm.nih.gov/pubmed/10442682 (last visited July 28, 2017).

[4] Tachycardia means "too fast," characterized by heart rates of more than 100 beats per minute. *Tachycardia | Fast Heart Rate.* AMERICAN HEART ASSOCIATION, http://www.heart.org/HEARTORG/Conditions/Arrhythmia/AboutArrhythmia/Tachycardia-Fast-Heart-Rate_UCM_302018_Article.jsp#.WUh7_Gjys2w (last visited June 16, 2017).

[5] An implantable cardioverter defibrillator ("ICD"), is similar to a pacemaker.

occurring several times a day, Dr. Soo re-categorized her as NYHA Class II status[6] because she denied chest pain, shortness of breath, and labored breathing on exertion. (*Id.* at 717-18.)

On November 4, 2014, Dr. Corpuz diagnosed McBride-Meyers with obesity, hypercholesterolemia,[7] and chronic systolic heart failure. (Tr. at 714.) During a follow-up examination on December 5, 2014, nurse practitioner Bridget Mercaldi diagnosed McBride-Meyers with non-ischemic heart disease, an enlarged heart, and congestive heart failure and indicated that she was stable at NYHA Class II status after implantation of her ICD. (*Id.* at 710.) On January 6, 2015, Dr. Corpuz diagnosed McBride-Meyers with morbid obesity, high blood pressure, and hypercholesterolemia. (*Id.* at 703.)

### D. Testimony of the Vocational Expert

Vocational expert Michael Smith testified at the April 23, 2015 hearing (Tr. at 39.) ALJ Catanese and Forte asked Smith three hypotheticals about a claimant with McBride-Meyers's age, education, and work experience, who could not climb ladders, ropes, or scaffolds, but could perform all other postural activities on a frequent basis, and needed to avoid concentrated exposure to workplace hazards, like unprotected heights or dangerous machinery. (Id. at 57-58.)

Smith testified that a claimant with the aforementioned non-exertional limitations, who could perform no greater than light work activity could perform McBride-Meyer's prior job as a bookkeeper. (Id.) When asked whether a hypothetical individual with the same non-exertional limitations, but who could only perform sedentary work could perform McBride-Meyer's former

---

[6] Class II status is based on patient symptoms and is defined as "slight limitation of physical activity, comfortable at rest, ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath)." *Classes of Heart Failure.* AMERICAN HEART ASSOCIATION,
http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp (last visited June 16, 2017).
[7] Hypercholesterolemia is a condition characterized by cholesterol concentration levels greater than 700 mg/dL. *LDL > 500 mg/dL Research Studies.* U.S. NATIONAL LIBRARY OF MEDICINE, April 13, 2017,
https://www.nhlbi.nih.gov/studies/nhlbi-trials/ldl-500-mgdl.

job as a bookkeeper, Smith testified that such a claimant could do the bookkeeper job as described in the DOT, but could not do the bookkeeper job as it was actually performed. (Id.) Finally, when posed a hypothetical with the same set of non-exertional limitations but for a hypothetical individual who required "between two to three additional, unscheduled work breaks, of, approximately 15 minutes each during a typical eight-hour workday, and who would also be absent from the workplace . . . two to three days per month on a consistent basis," Smith testified that such a person could neither perform McBride-Meyers's previous job as a bookkeeper, nor perform any job in the national economy. (Tr. at 58-59.)

Smith further testified that a hypothetical claimant with the identical limitations as above, but with an added restriction to "simple, routine work of the unskilled nature," because of the claimant's fatigue, could not perform work as a bookkeeper since the Dictionary of Occupational Titles classifies bookkeeper as "a skilled occupation." (Tr. at 59.)

**E. Findings of ALJ Louis M. Catanese**

On June 1, 2015, ALJ Catanese issued his decision that McBride-Meyers was not disabled under sections 216(i) and 223(d) of the Social Security Act and had not been disabled since April 12, 2013.[8] (Tr. at 23.) The ALJ followed the five-step sequential analysis described in 20 C.F.R. § 416.920. At step one, ALJ Catanese determined that McBride-Meyers had not engaged in substantial gainful activity since April 12, 2013. (Tr. at 25.) At step two, he found that McBride-Meyers suffered from severe impairment, including congestive heart failure and morbid obesity. (Id.)

---

[8] Although McBride-Meyers initially applied for Disability Insurance Benefits on August 30, 2013, the period at issue runs from April 12, 2013, the alleged disability onset date, to June 1, 2015, the date of the ALJ's decision. (Tr. at 137.)

At step three, ALJ Catanese determined that McBride-Meyers did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments of 20 C.F.R. Part 404, Subpart, Appendix 1, and thus McBride was not presumed disabled. (*Id.* at 26.) The ALJ concluded that McBride-Meyers's congestive heart failure did not meet the requirements of Listing 4.02. (*Id.*) ALJ Catanese found that the medical record generally reflected improving symptomology after starting medication management, citing McBride-Meyers's ability to go to the gym, "perform her own personal care," and drive; her reclassification as NYHA Class II status; and absence of heart-related findings. (Tr. at 27.) He also found that, although the record reflected that McBride-Meyers was morbidly obese, her weight "when considered singly and in combination with her other medically determinable impairments" did not medically equal a Listing impairment. (*Id.* at 27-28.)

At step four, considering McBride-Meyers's allegations "in the light most favorable to her," ALJ Catanese concluded that McBride-Meyers retained the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a). (Tr. at 28, 31.) The ALJ found that while McBride-Meyers could perform all postural activities frequently, she needed to avoid (1) climbing ladders, ropes, and scaffolds and (2) concentrated exposure to workplace hazards such as unprotected heights and dangerous machinery. (*Id.* at 28.) At step five, ALJ Catanese relied on Vocational Expert Smith's testimony to conclude that McBride-Meyers possessed the ability to perform the duties of a bookkeeper, as characterized by the Dictionary of Occupational Titles ("DOT").[9] (*Id.* at 32.) ALJ Catanese rejected the vocational expert's testimony regarding an individual limited to simple, unskilled, and routine work because of fatigue; "[a]lthough [McBride-Meyers]

---

[9] DOT Listing 210.382-014 describes Bookkeeper as "sedentary, skilled work with a specific vocational preparation (SVP) of six." (Tr. 32.)

chooses to take naps through the day, no treating source has opined that this is medically necessary." (*Id.* at 28.)

ALJ Catanese ultimately determined that the medical record failed to support McBride-Meyers's allegation that she cannot work. (Tr. at 31.) Although the ALJ found that McBride-Meyers's medically determinable impairments could reasonably be expected to cause her symptoms, he questioned her credibility, giving little weight to her statements concerning the "intensity, persistence and limiting effects of her symptoms." (*Id.* at 29.) The ALJ explained how McBride-Meyers's receipt of unemployment insurance benefits, inconsistencies between her sworn statements and medical records, and absence of severe symptomology all undermined her credibility. (Tr. at 29.)

In making his decision, the ALJ outlined McBride-Meyers's medical record. Throughout the period at issue, McBride-Meyers was categorized as National Institute of Health ("NIH") Class III "extreme" obesity status.[10] (Tr. at 31.) In April 2013, McBride-Meyers suffered from fatigue, leg swelling, and shortness of breath and had a LVEF of twenty-seven (27) percent. (*Id.* at 29-30.) Despite McBride-Meyers's improving symptomology and reports of going to the gym daily, she reported shortness of breath, fatigue, and a rapid heartbeat in May 2014. (*Id.* at 30.) In August 2014, McBride-Meyers had surgery to implant a pacemaker. (*Id.*) By October 2014, her heart failure was reclassified as NYHA Class II status. (*Id.*) The ALJ further substantiated his RFC determination using notes from subsequent doctor appointments, during which

---

[10] Individuals within NIH's Class III status have a body mass index of 40.0 and an extremely high risk for type 2 diabetes, hypertension and cardiovascular disease. *Classification of Overweight and Obesity by BMI, Waist Circumference, and Associated Disease Risk*, NATIONAL HEART, LUNG, AND BLOOD INSTITUTE, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_dis.htm (last visited June 16, 2017). *See also* SSR 02-1p. *Available at* https://www.ssa.gov/OP_Home/rulings/di/01/SSR2002-01-di-01.html.

McBride-Meyers "denied any cardiovascular symptoms, and no significant findings were reported." (*Id.*)

In his RFC assessment, ALJ Catanese assigned limited weight to Dr. R. Gauthier's physical RFC assessment for the State Disability Determination Service, dated September 18, 2013. (Tr. at 31.) The ALJ disregarded the assessment, which limited McBride-Meyers to the full range of light work, because it was based on an incomplete medical record. (*Id.*) ("The updated medical record supports greater limitations than opined by Dr. Gauthier."). Nevertheless, ALJ Catanese concluded that McBride-Meyers was not disabled and was capable of performing past relevant work as a bookkeeper.[11] (Tr. at 32.)

## III.   DISCUSSION

### A. Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's

---

[11] The ALJ clairified that "[t]his work did not include performance of work-related activities precluded by McBride-Meyers's residual functional capacity." (*Tr.* 31.) Though the DOT describes a bookkeeper job as sedentary, McBride-Meyers had previously performed her job at a "light exertional level."

decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a

reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to DIB. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a

disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. An ALJ should consider whether the severity of an individual's alleged symptoms is supported by objective medical evidence. Social Security Ruling ("SSR") 16-3P, 2016 WL 1119029, at *3. Second, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ must consider the entire case record, including objective medical evidence, a claimant's

statements about the intensity, persistence, and limiting effects of symptoms, statements and information provided by medical sources, and any other relevant evidence in the claimant's record. SSR 16-3P, 2016 WL 1119029, at *4-6. The evaluation of a claimant's subjective symptoms is not an evaluation of that person's character. *Id.* at *1.

In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2.    The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative or non-examining physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("SSA regulations provide a very specific process for evaluating a treating physician's opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler*, 3 F.3d at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. § 416.927(e).

The ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199-200 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

### 3.     Evaluating Credibility

The Social Security Act provides that "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability…" 42 U.S.C. § 423(d)(5)(A). Rather, there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce pain or other symptoms alleged…" *Id.* "It is the function of the [Commissioner], not the [reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted).

## C.  Issues on Appeal

On appeal, McBride-Meyers alleges that ALJ Catanese: (1) improperly determined her RFC, by failing to assign any weight to the opinion of McBride-Meyers's treating cardiologist, Dr. Gobikrishna; (2) improperly evaluated McBride-Meyers's credibility; and (3) failed to fulfill the burden of proof at step five of the disability evaluation test. She argues that these were not harmless errors and thus the case warrants reversal and remand to the agency for an award of benefits. (Pl. Mem. at 6-13.) The Commissioner maintains that the ALJ applied the correct legal standards in reaching his decision and that the decision is supported by substantial evidence. (Def. Mem. at 12-18.)

### 1.  The ALJ Improperly Determined McBride-Meyers's Residual Functional Capacity

McBride-Meyers asserts that ALJ Catanese failed to indicate what evidence supported his finding that she was limited to a range of sedentary work. (Pl. Mot. at 8.) Residual Functional Capacity ("RFC") is "an assessment of an individual's ability to do sustained work-related

physical and mental activities in a work setting on a regular and continuing basis," i.e., eight

hours a day, five days a week, or an equivalent work schedule.  SSR 96-8p (1996).  In an RFC

assessment, an ALJ must "first identify the individual's functional limitations on a function-by-

function basis." SSR. 96-8p.  In assessing the claimant's RFC, the ALJ "must include a narrative

discussion, describing how the evidence supports each conclusion," the claimant's "ability to

perform sustained work activities in an ordinary work setting on a regular basis," and "the

maximum amount of each work-related activity the individual can perform based on the

evidence available in the case record."  *Id.*  When assessing a claimant's RFC, an ALJ "must

consider 'all of the relevant medical and other evidence.'"  *Dowling v. Colvin*, No. 5:14-CV-786,

2015 U.S. Dist. LEXIS 122724, at *13 (N.D.N.Y. July 23, 2015) (quoting 20 C.F.R. §§

404.1545(a)(3), 416.945(a)(3) (2012)).

"Remand may be appropriate, however, where an ALJ fails to assess a claimant's

capacity to perform relevant functions, despite contradictory evidence in the record, or where

inadequacies in the ALJ's analysis frustrate meaningful review."  *Cichocki v. Astrue*, 729 F.3d

172, 177 (2d Cir. 2013) (citing *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001).  Here, the

ALJ's failure to (1) adhere to the treating physician rule; (2) specifically cite what evidence

supports his RFC determination, (3) reconcile contradictory evidence with his determination that

McBride-Meyers was not disabled, and (4) improperly evaluate McBride-Meyers's credibility

warrants remand.

### a.  The ALJ Failed to Properly Apply the Treating Physician Rule

McBride-Meyers argues that ALJ Catanese erred by failing to admit into the record and

consider opinions from treating cardiologist Dr. Gobikrishna.  (Pl. Mem. at 7.)  After an

examination on March 1, 2014, Dr Gobikrishna filled out a Cardiac Impairment Questionnaire.

(Pl. Mem. Ex. A (Cardiac Impairment Questionnaire) at 5-10.) In the questionnaire, Dr. Gobikrishna used results from a cardiac catheterization, which showed an ejection fraction of forty-one percent, and an echocardiogram to diagnose McBride-Meyers with NYHA Class II – Class III chronic heart failure. (*Id.* at 5-6.) Some clinical findings included shortness of breath, fatigue, weakness, and palpitations. (*Id.* at 5.) Dr. Gobikrishna noted McBride-Meyers's inability to walk more than two blocks and the triggering of McBride-Meyers's cardiac symptomatology by minimal exertion and by cold and hot weather. (Pl. Mem. Ex. A (Cardiac Impairment Questionnaire) at 6-7.) Dr. Gobikrishna further noted that McBride-Meyers's symptoms and functional limitations, which he dated back to April 2013, were reasonably consistent with her physical impairments and her experience of pain, fatigue, and other symptoms were severe enough to constantly interfere with her attention and concentration. (*Id.* at 6, 8-9.) Dr. Gobikrishna opined that McBride-Meyers's symptoms would likely increase if she were placed in a competitive work environment and that McBride-Meyers would likely be absent form work more than three times a month as a result of her cardiac impairment and treatment. (*Id.* at 7-8.) He further opined that McBride-Meyers needed to avoid wetness, fumes, gases, temperature extremes, humidity, dust, and heights and her condition prohibited pushing, pulling, kneeling, bending, and stooping. (*Id.* at 9.) While the medical evidence presented in the Cardiac Questionnaire favors an award of DIB, it was not included in either the certified administrative recorded or the ALJ's decision, despite having been submitted to and received by the Social Security Administration on April 20, 2014. (Pl. Mem. at 3, n. 12; Ex. A at 1-2.)

Here, Dr. Gobikrishna's opinion was entitled to "controlling weight" because it both was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. §

404.1527(c)(2); *see also Greek*, 802 F. 3d at 376. Dr. Gobikrishna is a board-certified cardiologist who had served as McBride-Meyers's treating cardiologist since April 12, 2013, the onset date of the alleged disability. (Tr. at 225.) To complete the March 2014 questionnaire, Dr. Gobikrishna used results from a cardiac catheterization and an echocardiogram. On May 20, 2014, Dr. Corpuz also noted McBride-Meyers's tachycardic heartbeat, fatigue, shortness of breath, and inability to walk up stairs. (*Id.* at 740, 742.) On August 22, 2014, Dr. Kim diagnosed McBride-Meyers with non-ischemic dilated cardiomyopathy with severe congestive heart failure and deemed her a candidate for prophylactic "implantable defibrillator therapy". (*Id.* at 730.)

Even if the ALJ had determined that Dr. Gobikrishna's opinion was not entitled to "controlling weight," SSA regulations and case law make clear that because the Dr. Gobikrishna is McBride-Meyers's treating physician, the ALJ was required to explain the weight ultimately given to his opinions with sufficient particularity for the reviewing court to determine whether the assignment of weight was based on "good reasons." *Gunter*, 361 Fed. Appx. at 199. While ALJ Catanese explained why he gave limited weight to the opinions of Dr. Kim and Dr. R. Gauthier, he failed to assign any weight to Dr. Gobikrishna's opinions. (*Id.* at 30-31.)

The Commissioner asserts that "the fact that the ALJ did not mention [Dr. Gobikrishna's] opinion does not mean that the ALJ did not consider it. (Def. Mem. at 12.) The Commissioner continues saying that "it is clear that the ALJ considered this opinion, and incorporated many of Dr. Gobikrishna's assessed limitations into the RFC finding, but did not accept certain limitations expressed in that opinion." (Def. Mem. at 12.) "[W]hile contradictions in the medical record are for the ALJ to resolve, they cannot be resolved arbitrarily." *Gunter*, 361 Fed. Appx. at 199-200 (*citations omitted*). The ALJ erred by failing to mention Dr.

Gobikrishna's questionnaire and to explicitly explain the weight, if any, assigned to Dr. Gobikrishna's opinion.

The Commissioner also incorrectly argues that ALJ Catanese's failure to expressly weigh Dr. Gobikrishna's opinion was "at most harmless error." (Def. Mem. at 14.) In *Greek v. Colvin*, the ALJ posed a hypothetical to the vocational expert based on the claimant's treating physician's medical opinion that he required additional breaks beyond a lunch break and other normal breaks. *See* 802 F.3d 370, 374 (2d Cir. 2015). The vocational expert testified that this limitation would "eliminate all competitive jobs in the national economy." (*Id.*) The court held that because the vocational expert testified that an individual with the limitations described by Greek's treating physician "could perform no jobs available in large numbers in the national economy," the ALJ's failure to "provide adequate reasons for rejecting Dr. Wheeler's opinion was not harmless." *Id.* at 376. In this case, vocational expert Smith testified that an individual who could perform no greater than sedentary work activity, but required, as Dr. Gobikrishna opined, "between two to three additional, unscheduled work breaks, of, approximately 15 minutes each during a typical eight-hour workday, and who would also be absent from the workplace . . . two to three days per month on a consistent basis," could neither perform McBride-Meyers's previous job as a bookkeeper, nor perform any job in the national economy. (Tr. at 58-59.) Thus, as in *Greek*, the ALJ's failure to explain his reasoning for rejecting Dr. Gobikrishna's opinion was not harmless.

Accordingly, the Court finds that remand to the Commissioner is warranted for proper application of the treating physician rule to the opinion of Dr. Gobikrishna.

### b.  The ALJ Failed to Properly Evaluate McBride-Meyers's Credibility

ALJ Catanese found that, although McBride-Meyers's "medically determinable impairments reasonably could be expected to cause the alleged symptoms," McBride-Meyers's statements about the alleged intensity, persistence, and limiting effects of the symptoms were not credible.  (Tr. at 28-29.)  The ALJ questioned McBride-Meyers's credibility, highlighting inconsistencies between her sworn statements and medical records concerning her gym use, her failure to report health complaints during "several doctor visits," and her receipt of unemployment insurance benefits.  (*Id.* at 29-30.)  Generally, an ALJ's credibility determination is entitled to deference because he had the opportunity to observe the plaintiff's demeanor while testifying.  *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).  However, ALJ Catanese's reasoning behind discrediting McBride-Meyers is unsupported by substantial evidence.

If symptoms suggest a greater impairment than can be shown by objective evidence alone, the ALJ should consider several factors to determine credibility, including (1) the person's daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and adverse side effects of medication that the person has taken to alleviate the symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; and (6) any measures which the person uses or has used to relieve the pain or other symptoms.  *Eschevarria v. Apfel*, 46 F. Supp. 2d 282, 292 (S.D.N.Y. 1999).  *See also* 20 C.F.R. 404.1529 (2011).

To discount McBride-Meyers's testimony about her subjective symptoms, ALJ Catanese scrutinized McBride-Meyer's daily activities, namely her gym use.  The ALJ cited to the "History of Present Illness" section of Dr. Makower's notes from June, September, and

December 2013. (Tr. at 29.) In this section, oncologist Dr. Makower noted that McBride-Meyers was "going to the gym daily." (*Id.* at 273, 282, 745.) Closer examination of the section reveals the use of the same, exact language for all three visits. (*Id.*) ("…Coumadin was D/Ced after completion of endocrine therapy. The patient presents for oncology follow-up. She was recently diagnosed with congestive heart failure…") The only differences between the sections is that the June 2013 notes list McBride-Meyers's age as 51 instead of 52 and the September 2013 notes include "She is due for mammogram this month. She is past due for GYN," at the end of the paragraph. (*Id.* at 273, 282.) While these slight differences might suggest that the "History of Present Illness" section was up-to-date, the fact that the section is the only section that is not labeled "Reviewed Today" undermines the assumption that the section represents an up-to-date view. (*Id.* at 273, 282, 745.) The reliability of the notes is further undermined because, while these notes state that McBride-Meyers has never smoked and does not drink, other notes by Dr. Gobikrishna and Dr. Kim indicate that McBride-Meyers is an ex-smoker, who quit in 2005, and an occasional user of alcohol. (*Id.* at 224, 323, 639, 730.)

ALJ Catanese then noted inconsistencies between McBride-Meyers's sworn statements and the medical record. (Tr. at 29.) The ALJ notes other inconsistencies between McBride-Meyers's testimony at the hearing and her Function Report, dated September 12, 2013. (Tr. at 174.) In the Function Report, McBride-Meyers wrote that she goes to the gym to walk on the treadmills about once or twice a week. (*Id.*) During the June 1, 2015 hearing, however, she testified that she no longer went to the gym and had stopped going "just before [she] got the heart problem." (*Id.* at 53.)[12] The ALJ cites to further inconsistencies between McBride-Meyers' sworn statements notes from May and August 2014 in which Dr. Corpuz and Dr. Bader

---

[12] Because the ALJ did not follow up to determine when McBride-Meyers's heart problem began, it is not clear when she stopped going to the gym.

recorded that McBride-Meyers "tries to go to the gym," in an attempt to undermine McBride-Meyers's credibility. (*Id.* at 29, 555, 740.) These notes, however, fail to document how many times McBride-Meyers actually exercised weekly. Because trying to go to the gym and going to the gym are distinct, it is not necessarily true that McBride-Meyers misrepresented her gym use. Even if McBride-Meyers misrepresented her gym use during the hearing, this alone is not enough evidence to diminish her credibility about her subjective symptoms. McBride-Meyers's claims about her inability to walk far and or up stairs without experiencing shortness of breath or needing to rest, for example, is well documented and supported in the medical record by multiple board-certified physicians. (*Id.* at 176-77, 215, 494, 730, 740.)

ALJ Catanese next mischaracterizes evidence about the location, duration, frequency, and intensity of McBride-Meyers's pain and other symptoms to undermine her credibility. (Tr. at 29.) The ALJ highlights her lack of complaints during "several doctor visits," citing her visits in December 2013 with Dr. Makower and September 2014 with Dr. Moline. (*Id.* at 290-992, 722-25.) Dr. Makower is McBride-Meyers's oncologist and Dr. Moline is an OB/GYN. (*Id.* at 290, 722.) The visit with Dr. Makower was an oncology follow-up to monitor McBride-Meyers's breast cancer and the visit with Dr. Moline was a routine, annual check-up. (*Id.* at 290, 722.) The ALJ cannot infer that McBride-Meyers is not credible for failing to report cardiac symptomology to non-cardiac-related specialists.

The ALJ then cited notes from McBride-Meyers's visit with Dr. Makower on April 25, 2013. (Tr. at 29.) ALJ Catanese uses McBride-Meyers's statement that she was "feeling much better since being placed on medications" out of context to undermine her credibility. (*Id.*) McBride-Meyers's oncology visit with Dr. Makower was less than ten days after her first major

cardiac episode; saying that one feels "much better" after experiencing heart failure so recently does not weigh against one's credibility as to her assessment of her overall condition.

In his determination of McBride-Meyers's credibility, ALJ Catanese failed to consider the type, dosage, effectiveness, and adverse side effects of McBride-Meyers's treatment. *Eschevarria v. Apfel*, 46 F. Supp. 2d 282, 292 (S.D.N.Y. 1999). *See also* 20 C.F.R. 404.1529(c)(3)(iv) (2011). The side effects of the medications prescribed for McBride-Meyers during the period at issue mirror the symptomology she experienced. After McBride-Meyers's initial April 12, 2013 hospitalization, Dr. Gobikrishna prescribed her aspirin, Spironolactone, and Digoxin. (Tr. at 223,274, 278, 283, 289, 333, 477-78, 495, 762.) Fatigue, dizziness, tachycardia, and nausea are side effects of each of these drugs. *See Lanoxin (Digoxin)*, FDA, November 2011, https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/020405s006lbl.pdf; *Aldactone, Spironolactone Tablets*, FDA, January 2008, https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/012151s062lbl.pdf; *Aspirin and Heart Disease*. MEDLINEPLUS, https://medlineplus.gov/ency/patientinstructions/000092.htm. After a follow-up appointment with Dr. Gobikrishna, he reported that McBride-Meyers was "having severe nausea and dizziness" after starting Digoxin and Spironolactone. (Tr. at 478.) During the ALJ hearing, McBride-Meyers described chest pain and her inability to bend down and pick things off the floor without getting dizzy. (Tr. at 51, 54.) Throughout the period at issue, Dr. Gobikrishna prescribed McBride-Meyers Carvedilol, Lisinopril, and Furosemide, a beta-blocker, angiotensin-converting enzyme ("ACE") inhibitor, and diuretic, respectively, used to treat heart failure.[13] (Tr. 273, 278, 282, 289, 333, 477-78, 495, 762.) All three of these drugs

---

[13] *Medications Used to Treat Heart Failure*, American Heart Association, May 9, 2017, http://www.heart.org/HEARTORG/Conditions/HeartFailure/TreatmentOptionsForHeartFailure/Medications-Used-to-Treat-Heart-Failure_UCM_306342_Article.jsp#.WUwVMWjys2w.

have been reported to cause chronic fatigue, further supporting McBride-Meyers's symptomology.[14] In her Function Report, dated September 12, 2013, McBride-Meyers reported constant fatigue, shortness of breath, and an inability to "finish what [she] start[s]." (Tr. at 171, 177.) She noted needing to take breaks while getting dressed and "take her time" while showering and cleaning her apartment. (*Id.* at 171, 173.) During the ALJ hearing, McBride-Meyers again described being tired all the time and needing to take naps throughout the day. (*Id.* at 52-53.) In his March 2014 Cardiac Impairment Questionnaire, Dr. Gobikrishna noted that McBride-Meyers's cardiac medications were "likely to reduce…b[lood] p[ressure], resulting in symptoms such as dizziness. (Pl. Mem. (Exhibit A) at 7.) The ALJ erred by failing to inquire about the side effect of McBride-Meyers's medication, as required pursuant to the rules. On the remand, the ALJ should consider the aforementioned side effects on remand.

ALJ Catanese also neglected to consider McBride-Meyers's need for surgical implantation of a pacemaker in his evaluation of McBride-Meyers's credibility and alleged symptomology. McBride-Meyers's referral for ICD implantation and eventual implantation strengthen McBride-Meyers's statements about the severity of her symptoms. After an echocardiogram by Dr. Gobikrishna on April 26, 2013, confirmed McBride-Meyers's ejection fraction to be twenty percent, Dr. Gobikrishna noted, "We will repeat the echocardiogram in three to six months, and if the ejection fraction continues to be thirty-five percent or less, we will consider placement of the defibrillator." (Tr. at 324.) On August 22, 2014, McBride-Meyers was referred to the Arrhythmia Service for a prophylactic implantable cardioverter defibrillator, or pacemaker, because of her severe congestive heart failure "despite medical treatment over one

---

[14] Dr. Armon B. Neel, Jr., *9 Types of Medications that Can Lead to Chronic Fatigue*, AARP, June 2012, http://www.aarp.org/health/drugs-supplements/info-06-2012/medications-that-cause-chronic-fatigue.html. *See also Coreg*, FDA, February 2005, https://www.accessdata.fda.gov/drugsatfda_docs/label/2005/020297s013lbl.pdf.

year." (*Id.* at 728-29.) On August 26, 2014, before the implantation of the pacemaker, Dr. Bader noted that the implantation of the ICD was for "primary prevention of sudden cardiac death."

Even if we accept the ALJ's characterization of McBride-Meyers's statements about her gym use as inconsistent, her extensive and consistent work history, daily activities, medication, pacemaker, and other measures used to relieve her pain and symptoms support her subjective symptom claims. The Second Circuit has held that a "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983). "This is because a claimant with an established history of employment is unlikely to be 'feigning disability.'" *McCall v. Astrue*, 05 Civ. 2042 (GEL), 2008 U.S. Dist. LEXIS 104067, at *71-72 (S.D.N.Y. Dec. 23, 2008) (quoting *Wilber v. Astrue*, No. 07 Civ. 575, 2008 U.S. Dist. LEXIS 25035, at *3 (W.D.N.Y. Mar. 28, 2008)). McBride-Meyers has a lengthy, uninterrupted work history sustaining earnings every year for thirty-three (33) years prior to the onset of her disability. (Tr. 146-47.) Thus, even if we characterize McBride-Meyers's statements about her gym use as inconsistent, her statements about her symptoms should have been given more weight.

Although it was proper for the ALJ to consider the receipt of unemployment benefits in the assessment of McBride-Meyers's credibility, it cannot be a determinative factor in assessing disability. *Andrews v. Astrue*, at *38 (N.D.N.Y. Aug. 21, 2012). Moreover, the ALJ's reference to McBride-Meyers's statement to Dr. Corpuz about her desire to "work with children" during the time of her alleged disability does not prove that she was not disabled. (Tr. at 29); *Rivera*, 717 F.2d at 725 (finding that any evidence of a claimant's desire to work emphasizes the positive value of the claimant's work history). Moreover, there is no evidence in either the transcript of

the hearing or record that McBride-Meyers worked or even applied to any jobs during the period in which she alleged disability.

"While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony, she cannot simply selectively choose evidence in the record that supports her conclusion." *Pluck v. Astrue*, 10-CV-02042 (JG), 2011 U.S. Dist. LEXIS 23914, at \*55 (E.D.N.Y. Mar. 9, 2011) (quoting *Gecevic v. Secretary of Health and Human Services*, 882 F. Supp. 278, 286 (E.D.N.Y. 1995)). During the ALJ hearing, in the Daily Activities Questionnaire, and throughout multiple doctor visits with Dr. Corpuz, Dr. Gobikrishna, and Dr. Kim, McBride-Meyers reported needing to take breaks in between her daily activities and needing to take naps throughout the day to relieve her shortness of breath and fatigue. (Tr. 52-53, 171, 175-77, 215, 323, 494 740-42.) Here, ALJ Catanese fails to address the evidence in the record that contradicts his conclusion, instead relying on evidence which reinforces his belief that McBride-Meyers is not credible.

Accordingly, the Court finds that remand to the Commissioner is warranted to reassess McBride-Meyers credibility in accordance with the factors set forth under 20 C.F.R. § 404.1529(c)(3).

### 2. The ALJ Failed to Fulfill His Burden of Proof in Assessing the Availability of Jobs in the National Economy

At the fifth step of the sequential evaluation of disability, the Commissioner bears the burden of proving that the claimant is capable of performing other jobs existing in significant numbers in the national economy, in light of the claimant's RFC, age, education, and past relevant work. *Carvey v. Astrue*, 06-CV-0737 (NAM) 9(DEP), 2009 U.S. Dist. LEXIS 90974, at \*35 (N.D.N.Y. Sept. 30, 2009); *see also* 20 C.F.R. §§ 416.920, 416.960 (2012). The Supreme Court has ruled that "Social Security proceedings are inquisitorial rather than adversarial. It is

the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S., 103, 110-11 (2000). Here, ALJ Catanese improperly disregarded the vocational expert's testimony and selectively highlighted evidence in the record that supported his conclusions, thus failing to carry the burden of proof at the fifth stage of the disability analysis. *See Grace v. Astrue*, 11 Civ. 9162 (ALC)(MHD), 2013 U.S. Dist. LEXIS 107697, at *65 (S.D.N.Y. May 21, 2013).

While ALJ Catanese explained his reasoning for accepting the vocational expert's response to the first hypothetical and rejecting the vocational expert's response to the last hypothetical, he failed to address the vocational expert's response to the second hypothetical. ALJ Catanese's hypothetical involved an individual with McBride-Meyers's age, education, and limitations, including requiring two to three "additional, unscheduled work breaks, of, approximately 15 minutes each during a typical eight-hour workday, and who would also be absent from the workplace…two to three days per month on a consistent basis." (Tr. at 58-59.) The vocational expert opined that an individual with the aforementioned restrictions could neither perform McBride-Meyers's previous job as a bookkeeper, nor perform any job in the national economy. (*Id.*) Vocational expert Smith further commented that an employer would likely not tolerate such a limited time at work. (*Id.*)

ALJ Catanese should have explained why he disregarded the testimony of the vocational expert, which supported McBride-Meyers's claim for disability insurance benefits. *See Grace*, 2013 U.S. Dist. LEXIS 107697, at *65 (citing *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006). While the ALJ's first hypothetical contained McBride-Meyers's non-exertional limitations, the second hypothetical added to those limitations the amount of absences and breaks she is likely to require, as described by Dr. Gobikrishna in his March 2014

Cardiac Impairment Questionnaire. (Doc. No. 13 (Ex. A) at 8.) Because the second hypothetical was more reflective of McBride-Meyers's condition, ALJ Catanese should have indicated why he failed to reconcile the vocational expert's contradictory testimony with his final determination of McBride-Meyers's condition.

Accordingly, remand is warranted for explanation of the omission of the vocational expert's testimony.

## D.  Remand is the Appropriate Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for rehearing.  Remand may be appropriate if "the ALJ has applied an improper legal standard. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  Moreover, when the ALJ has committed a legal error that may have affected the disposition of the case, such a failure constitutes a reversible error. *Pollard v. Halter*, 377 F.3d 183, 189 (2d. Cir. 2004). When the record is sufficiently developed for the court to conclude that more evidence would not affect the Commissioner's decision, remand for a calculation of benefits is appropriate. *Rosa*, 168 F.3d at 83.

Here, ALJ Catanese committed legal error in his determination of McBride-Meyers's RFC, failing to properly apply the treating physician rule, 20 C.F.R. § 404.1527, and improperly evaluating McBride-Meyers's credibility, and failed to fulfill the SSA's burden of proof at step five of the disability analysis.  The proper application of these principles could have affected the Commissioner's ultimate finding of disability.  The Court, therefore, rejects the ALJ's decision and remands for rehearing.

## IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** McBride-Meyers's motion for judgment on the pleadings in part, **DENIES** the Commissioner's cross motion, and **REMANDS** this case to the Commissioner for reconsider in accordance with this Opinion.  On remand, the ALJ must correctly apply the standards of 20 C.F.R. § 404.1527 when weighing the opinions of McBride-Meyers's treating physician, and to assess McBride-Meyers's limiting effects.  The Clerk of Court is directed to enter judgment.

**SO ORDERED this 29th day of September 2017**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**